IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 14, 2009

## EVELYN HOLLY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-07503     John T. Fowlkes, Jr., Judge**

**No. W2008-02703-CCA-R3-PC  - Filed May 20, 2009**

The petitioner, Evelyn Holly, appeals the post-conviction court's denial of her petition for post-conviction relief. On appeal, she argues that she received the ineffective assistance of counsel. Specifically, she argues that her trial counsel was ineffective in failing to investigate the effects of her mental condition and medication which precluded her from meaningful participation in her own defense. Additionally, the petitioner asserts that trial counsel failed to hire an expert to contradict the testimony of the medical examiner and failed to call a witness who would have exonerated her. After a thorough review of the record and the parties' briefs, the judgment of the post-conviction court denying post-conviction relief is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. McLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

R. Andrew Hutchinson, Memphis, Tennessee, for the appellant, Evelyn Holly.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rachel Newton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

BACKGROUND

Following a jury trial, the petitioner was convicted of second degree murder. Thereafter, she was sentenced to twenty years in the Tennessee Department of Correction. On appeal, this court affirmed the petitioner's conviction and sentence. *State v. Evelyn Holly*, No. W2002-01200-CCA-R3-CD, 2003 WL 22071446 (Tenn. Crim. App., at Jackson, Aug. 27, 2003), *perm. app. denied* (Tenn. Jan. 26, 2004). The following is a recitation of the convicting evidence set forth in this court's opinion on direct appeal:

According to Defendant's statement to the police, she and Mr. Kyles, the victim, had lived together for approximately ten months although she was still married to another individual. During their relationship, Defendant and Mr. Kyles had several altercations. One disagreement in 1998 resulted in both Defendant's and Mr. Kyles' arrest for aggravated assault, and a second confrontation in 1999 led to the couple's arrest for disorderly conduct.

On April 6, 2000, the couple first began arguing around noon when Defendant's husband telephoned her. Defendant and Mr. Kyles, however, "made up" and went to the grocery store to buy supplies for grilling outside that night. They made one more trip to the store that afternoon to buy beer. When they returned from this shopping trip, a young man arrived at the apartment and asked to see Defendant's son. Mr. Kyles thought the young man had come to visit Defendant, and this misunderstanding led to another argument which soon turned "physical." Mr. Kyles ran into the bathroom but left the door open a crack and told Defendant he was going to kill himself by taking some pills. Defendant tried to enter the bathroom, but Mr. Kyles held the door shut. Defendant then went into the bedroom and closed the door. For some reason, her son's girlfriend, Tina, brought Defendant a green-handled steak knife with a three-inch serrated blade. After the girl handed Defendant the knife, Mr. Kyles tried to get into the bedroom but Defendant leaned against the door and managed to prevent him from opening it. Defendant sat down on the bed and told Mr. Kyles she was going to leave him. About ten minutes later, Mr. Kyles came into the bedroom and began arguing with Defendant again. Defendant went into the bathroom, and Mr. Kyles followed. Defendant had her coat in her left hand and the knife in her right hand. Mr. Kyles grabbed the coat from Defendant to prevent her from leaving, then tried to wrestle the knife from her. Defendant jerked her hand loose, and the knife struck Mr. Kyles in his chest.

Defendant pressed a towel to the wound, but did not know how to perform CPR. She called out to her children to call an ambulance. Defendant continued to hold the towel to Mr. Kyles' chest until the emergency personnel arrived. After he was transported to the hospital, Mr. Kyles underwent surgery but died shortly thereafter.

Defendant said that during the incident her two sons and mother were in the living room and her daughter was in her bedroom. None of these persons, however, witnessed the killing. Defendant said she did not know Tina's last name or why Tina brought her a knife. While Defendant was in her bedroom, Tina stood by the kitchen door holding a brown-handled serrated knife in her hand. When asked what she thought Tina was going to do with the knife, Defendant replied that she guessed Tina was going to try and use it on Mr. Kyles. Defendant did not know what happened to the green-handled knife nor why a mop and bucket were in the bathroom. Defendant denied telling anyone to clean up the blood.

-2-

At trial, Michael Sinnock, a Memphis police officer, responded to the call about the incident at 10:45 p.m. When he arrived at the scene, one of the apartment's security guards and Defendant were leaning over the victim, and the security guard was performing CPR. Mr. Kyles, however was unresponsive. A one or one and one-half inch cut was located on Mr. Kyles' upper chest area. Defendant told Officer Sinnock that Mr. Kyles had rushed into the apartment with the stab wound and collapsed in the bedroom. Officer Sinnock smelled a strong odor of bleach or other type of cleaning supply in the bedroom. Officer Sinnock left the apartment to flag down the ambulance and then transported Defendant to the police station. During the ride, Officer Sinnock said that he did not speak with Defendant and did not remember if she asked him to take her to the hospital.

In April 2000, Bryant Jennings worked for the Memphis Police Department's crime response unit. When he arrived at Defendant's apartment, Mr. Kyles had already been taken to the hospital. Officer Jennings found the back bedroom in disarray with bloody towels and sheets strewn about the room. A bucket was in the bathtub in the bathroom. After photographing the scene, Officer Jennings discovered a green-handled steak knife wrapped in a brown paper bag in the dumpster that serviced the apartment complex. Officer Jennings did not know whether the knife was tested for fingerprints or blood evidence.

Dr. O'Brian Smith, the Shelby County Medical Examiner, performed an autopsy on Mr. Kyles the morning after his death. Although Mr. Kyles had undergone surgery, the stab wound was still visible. Based on the results of the autopsy, Dr. Smith testified that the knife blade entered Mr. Kyles' body between his ribs, injured his left lung and then penetrated his heart. The depth of the penetration was four and one/third inches. Mr. Kyles also had fresh scratches on his forehead and temple with old scratches already in the process of healing on his hands. An examination of the rib cartilage showed that the knife used in the attack was serrated and that the blade was turned as it was withdrawn. Dr. Smith testified that the characteristics of the cutting edge of the steak knife found in the dumpster were reflected in the surface of Mr. Kyles' rib cartilage. Dr. Smith also testified that a three-inch knife blade could penetrate four or more inches as a result of the compaction of the soft body tissues caused by the insertion of the knife. Another possibility explaining why the depth of penetration exceeded the length of the blade was the fact that the heart deflates after the large vessels are no longer filled with blood. As a result, the heart's position at the time of an autopsy may be further from the chest than at the time of the stabbing.

Dr. Smith said that the wound was a stab wound, not an incised wound. An incised wound is caused by a slicing motion of the knife, and the wound is generally longer than it is deep. A stab wound, however, is made by driving the point of the blade straight into the body leaving a deep wound with only a small cut on the skin's surface. Based on the depth of the knife's penetration, Dr. Smith said that the user held the knife in a firm grip with a fixed wrist.

Sergeant Sharon Mabon with the Memphis Police Department's felony response unit interviewed Defendant following the incident. The interview began at approximately three o'clock in the morning and ended approximately two hours later. Sergeant Mabon explained Defendant's rights to her, and Defendant agreed to make a statement. At the conclusion of the interview, Defendant read over her statement, then initialed each page and signed at the bottom of the last page of the statement. The substance of the statement is summarized above. Sergeant Mabon said that Defendant became physically ill before the interview began, and she brought Defendant some crackers and a soda.

On cross-examination, Sergeant Mabon said that she did not inquire into whether Defendant had trouble reading and writing. She did ask Defendant, however, whether she could read and write without glasses and Defendant responded affirmatively. Sergeant Mabon did not ask Defendant whether she had difficulties in school or whether she had been placed in special education classes. Defendant appeared alert and calm to Sergeant Mabon although she cried periodically during the interview.

*Id.* at *1-3.

On February 20, 2004, the petitioner timely filed a petition for post-conviction relief. Thereafter, post-conviction counsel was appointed, an amended petition was filed and an evidentiary hearing was held. At the hearing, the petitioner testified that trial counsel did not hire a forensic or medical expert to testify on her behalf at trial. The petitioner stated that at the time of the stabbing, her children, Marvin Scott, Larry Payne, and Teresa Payne, along with Marvin Scott's girlfriend, Tina, were at the apartment. The petitioner recalled that she and Mr. Kyles had been arguing and that during the argument, Tina bought her a kitchen knife with a green handle. The petitioner also remembered that, at some point, she saw Tina holding a different knife. The petitioner stated that counsel told her that she tried to locate and obtain statements from witnesses identified, however, the petitioner was not certain of the results of any investigation. According to the petitioner, she was not able to assist in preparing her case for trial and could not answer counsel's questions regarding the incident. The petitioner stated that at the time that counsel was preparing for the trial, she "was going through a lot of emotional problems." The petitioner stated that she was taking a "psych med," "Trisyndon" [sic], which had been prescribed "[b]ecause [she] was telling them that [she] wanted to commit suicide[.]" According to the petitioner, the medication did not make her memory worse, however it made her sleep a lot. The petitioner testified that she went through the eighth grade in school, attending special education classes. She agreed that her IQ had been reported to be 74 and that before trial, counsel arranged to have a mental evaluation performed.

Larry Payne testified that at the time of the incident, he was at the petitioner's apartment and claimed to remember the event "like it was yesterday." He stated that a security guard at the apartment complex had obtained a restraining order preventing him from coming to the complex. However, he came to the apartment because the petitioner invited him to a barbecue. Also at the apartment on the night of the stabbing were "Ronald Kyles [called 'Twin'], his grandmother, his

sister and her boyfriend, along with [his] niece Tina and Marvin Scott and [his] friend, Frank." Mr. Payne stated that the petitioner and Mr. Kyles began arguing in the bedroom. The petitioner had a knife because she had been cutting some meat and told Mr. Payne to "come and get this knife[,]" which he did. Mr. Payne heard Mr. Kyles tell the petitioner to ask Tina to stop flirting with him. As Mr. Payne came out of the petitioner's bedroom, he saw Tina standing in his sister's bedroom with a knife in her hand. Mr. Payne asked Tina what she was going to do with the knife and she replied, "I'm going to stab Twin," meaning Mr. Kyles. Mr. Payne went to get something to eat, but then heard a loud noise from the bathroom. He went to investigate the noise and saw a hole in the bathroom wall. He then noticed Tina standing in the petitioner's bedroom, still holding a knife. As Mr. Payne and Mr. Scott were looking at the hole in the bathroom wall, they heard a scream and Mr. Kyles came running into the bathroom with a deep cut in his chest. The petitioner then came into the bathroom and stated, "Twin, I did not mean to push you." Mr. Payne testified that the petitioner told him that she pushed Mr. Kyles, and then saw Tina "holding a knife in her hand with blood on it." Mr. Payne stated that, at the time of the trial, he was available to testify and would have testified to these facts had he been called as a witness. He claimed that before the trial, he was interviewed by the petitioner's trial counsel, but was not called to testify at the petitioner's trial.

On cross-examination, Mr. Payne denied he told trial counsel that the petitioner told him that she stabbed Mr. Kyles. Mr. Payne stated that he was at the apartment when the police came, however, he denied that he gave the police a statement. According to Mr. Payne, a security guard came to the apartment and recognized him. The petitioner told Mr. Payne to leave because she did not want him to be arrested for a violation of the restraining order.

Trial counsel testified that in preparing the petitioner's case for trial, she had an investigator interview all of the witnesses who were at the apartment at the time of the stabbing. After speaking with the petitioner, counsel determined the best defense strategy was not to call anyone who had given a statement to testify at trial because "their testimony would have been in direct conflict with what [the petitioner] said."

Counsel stated that before the trial, the petitioner told her the stabbing was an accident and claimed that immediately before the stabbing, she was holding her coat in one hand and a knife in the other hand. The petitioner explained that when she jerked her coat, she accidently stabbed Mr. Kyles. One of the petitioner's sons claimed to have been in the room when the stabbing occurred and said that Mr. Kyles tripped and fell on the knife. The medical examiner, Dr. Smith, met with counsel and told her that the stabbing could not have been an accident. After speaking with Dr. Smith, counsel again spoke with the petitioner who then stated that she had been advised by "a church lady" to tell her attorney everything. The petitioner told counsel that during an argument with Mr. Kyles, he put a hole in the wall of the bathroom and the petitioner became angry, chased Mr. Kyles, and then stabbed him. Counsel agreed that she did not hire a medical expert to testify on behalf of the petitioner, however, she stated that no issue was identified as questionable or in need of expert review. Counsel stated that she had worked with Dr. Smith in the past on numerous cases and trusted his opinion.

On cross-examination, counsel stated that she had been with the Public Defender's Office for over seventeen years. Counsel stated that unless a need for an expert was indicated, it was not

standard practice for defense counsel to hire a medical expert in all cases. Counsel stated that in her experience, Dr. Smith had been fair to both sides in reviewing the medical evidence. Counsel stated that none of the witnesses interviewed stated that Tina stabbed Mr. Kyles. According to counsel, the day of the post-conviction hearing was the first time she had heard anyone say that Tina had a knife with blood on it.

The post-conviction court denied the petition for post-conviction relief by written order entered November 7, 2008. The court found, *inter alia*, that the petitioner failed to establish the factual allegations contained in her petition by clear and convincing evidence. The petitioner filed a timely notice of appeal.

ANALYSIS

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is de novo with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

In order to establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id.* at 697. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.*

The petitioner alleges that counsel was ineffective in failing "to inquire about [the petitioner's] medication" and asserts that "the outcome [of the trial] would have differed" if the petitioner were able to take a more active role in her defense. She contends that the medication made her "drowsy" and "incoherent" and prevented her from "assist[ing] her attorney in trial strategy." The petitioner further asserts that counsel did not pursue all available defenses, and did not: (1) "make an effort to obtain an expert to contradict, confirm, or explain the testimony of the state's medical examiner Dr. Smith," or (2) "call all available witnesses that could have possibly exonerated [the petitioner]."

Upon review of the record, we conclude that the petitioner failed to demonstrate that she was denied the effective assistance of counsel. The petitioner asserts that counsel failed to inquire into the petitioner's ability to assist with her defense and claims that the petitioner's mental condition and medication impaired her ability to participate in her defense. The petitioner testified that she had attended special education classes through the eighth grade. She stated that before the trial, due to her desire to commit suicide, she had been prescribed "Trisyndon" [sic]. However, the petitioner denied that the medication made her memory worse and stated that it caused her to sleep a lot. Contrary to the petitioner's allegation, she agreed that counsel arranged to have a mental evaluation performed before her trial. No further proof was presented at the post-conviction hearing to support the assertion that the petitioner was impaired or unable to assist with her defense. The record does not support that the petitioner established deficient performance by counsel with regard to the petitioner's mental condition or the effects of her medication on her ability to assist with her defense.

The petitioner also asserts that counsel failed to pursue available defenses. The petitioner argues that counsel failed to obtain an expert to "contradict, confirm, or explain the testimony of the state's medical examiner." However, the petitioner has not shown how an expert would have been beneficial to the petitioner's defense. Counsel testified that according to Dr. Smith's report of his examination of Mr. Kyles' wound, the stabbing was not an accident. Counsel stated that after she relayed Dr. Smith's opinion to the petitioner, the petitioner admitted that she stabbed Mr. Kyles. Counsel further testified that she had worked with Dr. Smith in the past and stated that in evaluating cases, Dr. Smith was fair to both sides. We conclude that the record does not support the petitioner's claims that counsel's failure to obtain an expert constituted deficient performance. We also determine that counsel's decision not to hire an expert was a reasonable strategic decision based upon adequate preparation and investigation.

Finally, the record does not support the petitioner's claim that counsel failed to put on evidence that possibly could have exonerated the petitioner. Larry Payne testified at the post-conviction hearing that immediately after the stabbing, he saw his brother's girlfriend, Tina, holding a bloody knife. Mr. Payne further testified that before the petitioner's trial, he told counsel that Tina was holding a bloody knife. Mr. Payne stated that he was available to testify at trial, however he was not called. Contrary to the petitioner's assertion, counsel stated that before the trial, Mr. Payne was interviewed along with other family members by an investigator. Counsel stated that no one had previously asserted that Tina had a bloody knife after the stabbing or that Tina stabbed Mr. Kyles. Counsel stated that she heard this assertion regarding Tina for the first time at the post-conviction hearing. The trial court credited the testimony of counsel over that of Mr. Payne, stating that Mr. Payne's "testimony at the post-conviction hearing differed from his pretrial statement given to the

Defense." Our review of the post-conviction court's factual findings concerning the credibility of witnesses and the weight and value given their testimony is de novo with a presumption that the findings are correct. *See Burns*, 6 S.W.3d at 461. We conclude that the finding of the post-conviction court is supported in the record and is therefore presumed correct. Counsel testified that after her investigator interviewed those at the apartment at the time of the stabbing, she made the decision that the best defense strategy in the petitioner's case was not to call any of them as witnesses at the trial, because "their testimony would have been in direct conflict with what [the petitioner] said." As such, counsel made a reasonable strategic decision based upon adequate preparation and investigation. Accordingly, the petitioner is not entitled to relief on this issue.

## CONCLUSION

The petitioner has failed to meet her burden of proof regarding her claims of ineffective assistance of counsel, and the post-conviction court correctly denied the petition. Therefore, the judgment of the post-conviction court is affirmed.

_____
J.C. McLIN, JUDGE